Case number 19-1048, Brotherhood of Maintenance of Way Employees Division, I.D.T. Petitioner v. United States Department of Transportation, et al. Mr. Edelman, Mr. Petitioner, Ms. Kinsman, for the respondents, and Mr. Dupree for the interview. Good morning, Mr. Edelman. Good morning, Your Honors. I'm Richard Edelman, counsel for the Brotherhood of Maintenance of Way Employees. With the Court's permission, I would like to reserve two minutes of my time for rebuttal. In this case, the Federal Railroad Administration suspended the track safety regulation governing the frequency of manual visual track inspections under another regulation that permits a suspension if it is necessary for a test to evaluate new technology or operational approaches and the suspension is subject to conditions to assure safety. The MWE contends that neither requirement was satisfied here. I plan to focus initially on the necessity finding and then we'll address the safety condition issue if time permits. Now, the FRA's decision and its public notice summarily stated that the suspension was necessary for the test, which was expressly described as one to test automated track inspection technologies. But FRA did not actually explain why the suspension of the regulation was necessary to test the new technology. That the purpose of the test was to assess the new technology was clearly stated in the decision and the notice. The decision said the test was designed specifically to test the unmanned geometry car as a viable alternative to manual visual inspections and to test it as an optical visual platform to supplement manual visual inspections. The title of the notice in the Federal Register described the test as one to evaluate automated track inspection technologies. There are numerous other references in the decision and notice. It surely could have been clearer, but it does talk about utilizing track inspection technologies while evaluating appropriate supplemental manual inspection parameters. So there is some communication about the combinations and then the description of phasing also seems to clearly propose different combinations. Well, I understand that they've noted that what they were going to do was somewhat reduce the frequency with which the manual visual inspections were done. But every description of the purpose of the test said we are testing new technologies. This is technology we want to try out to see if it is a viable alternative to manual visual inspections. And the FRA did not even attempt to justify a conclusion that the test, that suspension was necessary to test the equipment. But they, again, as your Honor notes, they talk about this is mentioned in the decision on reconsideration of testing some optimal mix between manual visual inspections. Is that not much inherent in the idea of testing something as an alternative? I mean, I suppose there are occasions where you test something as an alternative, meaning sort of an on-off switch, all this or all that. But I would think for ordinary mortals accustomed to the need for information from different kinds of sources, the more natural reading would be what would a good mix be here? Well, your Honor, I think I actually referred to the dictionary definition and what could look to many others and alternative is usually actually described as either or. But more to the point, if you look at the record, if you look at everything in the FRA record leading up to the final decision, there isn't a mention of the mix. And when you look at the original. You're talking about the final decision. You're not talking about the denial of the petition for reconsideration. So I'm talking about, first of all, everything in the record leading up to including the denial of reconsideration. And when you look at the denial of reconsideration, joint appendix, page 120, that's where they say, oh, actually, this is about testing the best mix of manual, visual, and automated. There is no citation to the record to support that. If you look at page 120 there. I mean, apart from a sophisticated notion of alternative, wouldn't that be implicit in the phases that were involved, the gradual diminution in the visual inspection? I don't think so, Your Honor. I'm looking for something that maximizes the information at a reasonable cost. Well, I would submit not, Your Honor, because the phasing was a matter of increasing the amount of, increasing the amount of automated, decreasing the manual. Because, after all, the state track safety regulation, which uses this track safety standard, says this track, most of this track, is supposed to be inspected twice a week. The idea of actually phasing that up was posited by the FRA as something to assure safety, which is the other element. It was not used as a description of what the purpose of the test. So I have a more fundamental question, which is about, you know, there is kind of a chicken and egg problem. And when you have a technology which the agency alternatively describes as new and also known for 30 years, but you have something about which certain capacities are unknown, and you need to put it into operation and test to see whether it can be used in a new way or in a new scope. And the thing I don't follow is your contention that it could, there could be a bona fide test with the continuing inspection going along and remediation. Because if there's continuing manual inspection and remediation, we don't know what contribution the automated technology will make in the absence of the same frequency of manual inspection. Sure. So if what you are testing, which is what they said, is to see how the new technology works, they can be done side by side. The track inspectors can do their regular jobs twice a week inspecting the track, and the machine goes over and the machine can pick up whatever defects it picks up. So if that is your test, then they can certainly be done maintaining the current level. Because our people are doing the track inspections and the machine goes over. It's not, one does not preclude the other. Now, Your Honor, basically. What would be the information provided by the larger number of visual inspectors? I'm sorry? What would the railroad do with the information provided by the extra number of inspectors? Well, first, it's not a. Under your scenario. It's not an extra. Would you sort of lock it out on a kind of random basis? First of all, it's not an extra number. It's the current number. By the status quo. But then it would be fixed. Well, so first of all, if they actually wanted to do this this way, they could document both. In fact, one might actually say a straight up comparison between what the inspectors find and what the machines find would provide more validity. Well, that might be one approach. But does that make the agency's approach arbitrary and capricious? Yes, if the agency did not describe the purpose of the test as to test the technology. Working backwards from the denial of reconsideration that has no predicate in the record. There is nothing in the record that says this is the purpose of the test. This court frequently considers denials of reconsideration. I'm sorry? This court frequently considers denials of reconsideration as part of the record. Absolutely. And I don't deny they can do it. If it was actually a clarification of or an expansion of the reasoning in the decision itself, not an entirely new rationale, which, as we saw in the Supreme Court's decision in the Department of Commerce, they can't make up a decision, make up a rationale after the fact. And the record, if you look at the record, which we've highlighted, it is all about testing the new technology. There is not a single statement in BNSF's petitions, in the communication between the FRA and the BNSF, in the decision itself that the purpose of this test is to assess this mix of the two. The idea was to take existing technology, these geometry cars, and use them for something they've not been used for before and see how they do. That's a test of the technology. And there is nothing in the record, BNSF never said that in their petition, that that's what they were going to do. I understand that they said they were going to reduce the number of manual inspections to help see what the machines do. Your thought is that the language in the denial of reconsideration, talking about evaluating combinations, was just a sort of unprovoked brainwave at the RFA? I would say it was a post-hoc rationale, yes. I want to see how it's post-hoc. Well, because there's nothing to support it in the record. It may make it unreasoned, but it doesn't make it post-hoc. All right. Well, it came up with that explanation after the entire six months of communications and 500 pages of documents back and forth. But you make it sound as something that a rational person couldn't have discerned from the materials before it. Well, I guess. I submit that, Your Honor, that it's not there and you shouldn't have to go looking for it. The agency has a purpose of the test, and to say that it's necessary, then they need to say what. If you were right on that, that there's no root in the original decision for the reasoning that was elaborated in the reconsideration decision, then the remedy would be vacate and remand, or potentially, if we think there's a basis for justification, remand without vacature. And then what would happen that would materially aid your client? Well, I would say that you would vacate and remand, and if they want to do it this way, they should do a proceeding. That's a public proceeding in which we can participate and address the various issues, including necessity. Our people are the actual track inspectors. Nobody got any ability. The things that we're talking about now, nobody from the union got to say. Nobody who actually does this work got to participate in any of that. Although now there are, in the record before us, there are declarations from various of these track inspectors. Right. Yes. But there are other things that the union would want to submit? Yes, sure. I mean, and that's what we got as it began to develop. But I think it's a proceeding to actually examine this and decide whether it's necessary and whether the conditions that are safe is what actually was called for, and that didn't happen. Thank you. Thank you. May it please the Court. I'm Dana Karasong for the government, and I will be sharing time with counsel for the intervener in this case. The agency here reasonably approved this test program with a temporary suspension of the twice-a-week visual inspections for this section of freight track in Nebraska and Wyoming in order to test the different combinations of visual and automated inspection technology. And you can see that from the test structure itself, which has these different phases, and each phase involves a different combination. Although I think Mr. Edelman's reading of that is arguably also reasonable, which is we're going to phase it in carefully with an aim to full substitution, but of course because it's a transition and there are some unknowns, we're going to do that. You know, we're not going to go zero to 60 overnight. We're going to go zero to 15 to 30 to 45 to 60 in phases so that we know we can handle it. And what's your best place in the record, in the original decision, where you think this, you know, mix rationale that's much clearer in reconsideration is at least presaged? Right. So I do think just in the Federal Register it lays out this test program and it says, therefore, it's necessary. Right? That sets that up. But looking at the agency's decision letter, it talks about testing inspection methodologies, talks about evaluating appropriate supplemental technologies. But here- Can you give us a page? J60 for inspection methodologies. But remember, the decision on review is the reconsideration decision, which connects those dots that you saw in the Federal Register from here is the test with these different, testing these different mixes, and then on reconsideration at J120, the agency explains that the purpose of this test is to test these different mixes. And J116, and also you see this in their original request for the test at J55, there's really exciting potential here because this is a possibility to, instead of having people every two weeks go up and down the track, we know people miss things. Can we use this technology? Can the railroads use this technology to get reams and reams of data about the state of the track at every moment over time and see how it's changing and send inspectors to the places where problems might be developing before that even starts, before the problems start, right? The railroad talks about that in their proposal at 55. The agency talks about it in the decision at 116. This potential to stop problems before they start is very interesting to the agency, and as the agency explained at 120, it can't get the data about how this all works if the two inspection regimes are happening simultaneously. I was, I mean, I think there's a real, as I said, chicken and egg problem, but in your own briefs, I think it's page 12, you describe this as new technology. On page 13, you say it's trying to improve using it for 30 years. So what do we make of that? It's familiar, it's new, what's new about it? Yeah, the timeline of railroad inspections are such that, I mean, people have been going up and down train tracks and looking at the tracks for much longer than 30 years. That's the old technology. So this possibility, and then the use of the automated technology as a straight supplement, just, you know, we'll add the automated to the tracks and continue doing the visual. That we've also been doing. The agency itself has a fleet of these automated inspection systems that it runs on Amtrak line. But what is new and exciting here. So you said a straight supplement. What does that mean? Oh, I'm sorry. What I meant was, let's see if we run the visual inspection and the automated inspection on the same track at roughly the same time. What's picking up more? And you can see it, for example, GA-18, this chart that shows the automated inspection is catching this much, the visual inspection is catching that much. We know that these automated inspections have the potential to catch a lot of things that the visual inspections don't catch. What's new here. But different things. I thought that some of the agency's presentations were somewhat artful in talking about numbers of things caught. But the union was pretty clear in saying that there are types of things that are not really that well caught by the geometry. Sure. So the agency addressed this in 121 at the decision. These things that visual, there are things that visual inspections are going to catch earlier. Most things the automated inspection will catch earlier. But there are some things visual inspections will catch earlier. Now, most of those things will affect the track geometry before they cause a problem. And the automated system, because it has the potential to detect these very minute changes in track geometry, should be able to identify these things before they actually become a problem that could cause a derailment. There are other things, vegetation growing up, blocking a signal, that could lead to an accident and a derailment. And the automated system doesn't catch that. But plants don't grow that quickly. So twice a month inspection ought to catch that. You clearly have not been in my garden. The weeds grow four feet in a weekend. Well, you know, this is a test on a defined section of track in Nebraska and Wyoming to make sure that this actually does work. And the thing that's new here, I do want to go back to that, because there is a lot of potential here to make railroads safer. The agency is interested in this data because of the potential that it could lead to new safety regulations that make trains more safe by using the data from these automated systems to see where there are slight changes from time to time that a person would not have had any way to see but can tell the railroad that a problem is developing there and then send the inspector to that part to look at it very carefully instead of having a person go the whole track where we know that they're missing things. So the point of the regulation here, the ability to grant these suspensions of regulation is to allow for this kind of test to look at whether there are ways to make things safer and to lead to these kinds of improved technologies. And I do want to say one quick thing about assuring safety, which is the way this test is set up. You can see, if you look at the chart in the Federal Register, the third column shows that at every stage, the safety metrics get more challenging to meet. So with visual inspection, the baseline is they're missing about 7, 6.95 defects per 100 miles of track. And at each stage, they have to show that there are fewer defects per 100 miles of track. So that's how we're assuring safety. That's how we're making sure that these things that the automated system is not as good at catching as quickly aren't making the tracks less safe overall. If there are no further questions, I ask the Court to deny the petition. Mr. Dupree. Thank you, Your Honor. Tom Dupree on behalf of the intervener of the Association of American Railroads. Judge Rao has exactly right in that the question before this Court is not did the agency choose the best course, the only course. The question before this Court is did the agency choose a rational, non-arbitrary way of gathering this data so that it could then be in a position to evaluate whether these new testing methodologies work. Judge Pillard, you asked about where the agency said in its original order about the idea that this is, in fact, a mix, that it's not as though the automated technology will fully replace the old-fashioned way of doing it. On JA-68, the agency in its original order states in reference to the optical visual platform, which is the automated technology or one of the automated technologies at issue, they say the purpose is to test an optical visual platform to supplement manual visual inspections. And, of course, the concept that these automated technologies will be working in tandem with the old-fashioned manual visual inspections is further made apparent by the remainder of the order, where it clearly lays out in a four-phase structure that I think Your Honor correctly described as baby steps. This is a process that is rolling out under the extremely close, effectively real-time supervision of the Federal Railroad Administration. They're seeing the data as it comes in. They're conducting their own double-checking to make sure everything is going along well. And, of course, before BNSF is permitted to progress from one phase to the other, the agency has to review what's come in, sign off on it to make sure that everything is going exactly as it should. BNSF currently has basically completed phase two. The results, in fact, dramatically exceeded the expectations and the target. We anticipated that it would catch a certain number of defects and you'd achieve a certain level of safety. And, in fact, the results from phase two dramatically exceeded, in terms of overall performance, where we expected the automated technologies to go. We don't have a record of that, right, because that's post. That's true. That's not in the record because it's post-decision. But, of course, the testing went on up through the end of phase two during the pendency of this appeal. And, again, the early returns vastly exceed expectations in terms of the safety benefits that are being delivered. So this is really just a test, both of technology but also of methodologies, because, of course, a critical element of this new technology is that rather than have inspectors spend their days walking up and down 50-mile stretches of track looking for loose joints and bolts and the like, the technology alerts them to places where they need to focus their attention. So that's the answer to their argument when they say, well, why can't you do both at once? That's why you can't do both at once, because the new methodologies require redeploying the inspectors, not to spend their days following just the endless march up and down the line as required by the regulations, but rather to see what the data is generating. When it says, hey, there might be a problem at mile 32 to 34, they redeploy. They go out and they inspect it. And, as I said, Phase 2 shows that this is working marvelously. So for those reasons, we ask that the petition be denied. I know it's not in the record on appeal, but is that public anywhere? Well, we've certainly communicated to FRA, so in that sense it's public. I'll see if we can submit some sort of – Just curious in terms of public facing, whether it is. Right. I'm not aware that they publicly reported the reports, but, again, we've made FRA aware of it. Just curious. Because notice is one of the concerns for the workers. So I was just curious about whether that's – Right, right. I understand. Well, it's entirely possible, since obviously the workers are part and parcel of this, that they're well aware of what the early results have shown. I would assume so. Thank you. Great. Thank you, Your Honor. Mr. Edelman, you have no time remaining for rebuttal, but we will, as is our custom, give you two minutes. Thank you. I appreciate it, Your Honor. Quickly, we don't dispute the potential value of the technology. What we dispute is the application of the regulation. The regulation requires a necessity finding. The necessity finding needs a rational basis in the record. Again, if there really was part of this, JA 120, where they tried to explain the rationale, would have cited something, something BNSF filed, something that the agency said earlier. They don't. They don't say that. We look at the fact that they're going to supplement manual visual inspections. One can supplement the manual visual inspections without changing them, without changing the current frequency of doing them. You're just running the optical visual machine in addition. So that's where … What about Mr. Dupree's argument that part of the system for which the test is designed, that the test is designed to test, is whether the workers could actually be deployed in a more efficient way and raise safety overall by using the technology and sending the workers to places where potential problems are lurking. Absolutely nothing in maintaining the current schedule would preclude that. They can still deploy those workers to do focused inspections. They can work overtime. They can increase the roster of track inspectors. There are other people who have track inspector seniority who could do that work. There is nothing in maintaining the regular schedule that would preclude the railroad from assigning inspectors to do focused inspections based upon the data that came out of the machine. Again, the idea … Mr. Dupree talked about the new methodology. Again, it's not stated anywhere in the record. Last, with regard to the current progress, as Your Honor noted, that's not anywhere in this. And, in fact, our people have submitted affidavits in support of the stay saying there were problems. Thank you, Mr. Dupree. Thank you, Your Honor. Case is submitted.
judges: Pillard, Rao, Williams